UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JOSEPH F. HARBISON, III
DBA JOSEPH F. HARBISON III
& ASSOCIATE,

        NO. CIV. S-04-2542 FCD JFM

      Plaintiff,

   v.

        MEMORANDUM AND ORDER

AMERICAN MOTORISTS INSURANCE
COMPANY,

      Defendant.

----oo0oo----

This matter is before the court on a motion for summary judgment filed by defendant American Motorists Insurance Company ("defendant" or "AMIC") pursuant to Federal Rule of Civil Procedure 56. In an earlier decision, subsequently reversed by the Ninth Circuit, this court granted AMIC's motion for summary judgment on the ground there was no potential for coverage, and hence AMIC had no duty to defend plaintiff Joseph Harbison ("Harbison"). The Ninth Circuit reversed, finding that AMIC had a duty to defend Harbison in an action brought against Harbison by a former co-counsel because there was a potential for coverage

1

based on various allegations in the complaint.  Defendant now moves for partial summary judgment as to plaintiff's claims for breach of the implied covenant of good faith and fair dealing and for punitive damages, arguing that the court can find as a matter of law that its denial of coverage was, at most, a reasonable mistake in judgment in interpreting and applying the policy and thus does not give rise to bad faith liability.

For the reasons set forth below, defendant's motion is DENIED.  Triable issues of fact remain as to the reasonableness of defendant's denial of plaintiff's professional liability claim, and thus, summary judgment cannot be entered in defendant's favor on the breach of implied covenant of good faith and fair dealing and punitive damages claims.

## BACKGROUND[1]

### A.    The Policy

Joseph F. Harbison, III & Associates is the named insured under a lawyers professional liability insurance policy issued by AMIC, Policy No. QJ 001620 01 (the "Policy"), for the policy period of February 15, 2003 to February 15, 2004, with limits of liability of $1,000,000 per claim and $2,000,000 in the aggregate.  (July 13 Order at 2.)  Joseph F. Harbison is an insured under the Policy.

---

[1]      In some respects, these facts are taken from the court's prior memorandum and order ruling on AMIC's previous motion for summary judgment: Harbison v. Am. Motorists Ins. Co., No. CIV-S-04-2542 FCD/JFM, filed July 13, 2005 (Docket # 16) ("July 13 Order").  Though the parties did not set forth some of these facts on the instant motion, the facts are necessary to provide full context to the issues raised herein.  The facts are undisputed as indicated in the July 13 Order.

Section B of the Policy, "What is Covered," provides in part:

> "Subject to all terms and conditions of this policy, we will pay on your behalf those damages and defense expenses arising out of a claim or pre-claim incident that you first become aware of and report to us in writing during the policy period provided that the claim or pre-claim Incident arises out of your acts, errors or omissions that occurred on or after the prior acts date shown in the Declarations."

(<u>Id.</u>) Section A of the Policy, "Definitions," provides in part:

> "Whenever used in this policy, the term:
>
> 1.   Claim means any demand received by you for money, services or any other thing of value arising out of your acts, errors or omissions in providing professional services.
> * * * *
> 10. Professional services [is defined in relevant part as] services you perform:
> a.   For a client in your capacity as a lawyer;
> * * * *

(<u>Id.</u> at 2-3.)  Section C of the Policy, "Defense and Settlement," provides in part: "We will provide for a defense of claims against you seeking damages . . . ."  (<u>Id.</u> at 3.)  Section G of the Policy, "Exclusions," provides in part:

> "This insurance does not apply to:
> * * * *
> 7. Any claim arising out of acts, errors, or omissions that occurred prior to the effective date of this policy if, on or prior to such date, you knew or had a reasonable basis to believe either that a professional duty had been breached or that a claim would be made.
> 8. Any claim arising out of a criminal, intentionally wrongful, fraudulent or malicious act or omission.
> * * * *
> 10. Liability to others which you assume under any contract or agreement."

(<u>Id.</u>)

**B.   The Klawitter Action**

On or about September 2, 1998, Christopher J. Olsen ("Olsen") and Kathleen Klawitter ("Klawitter") entered into a written contingent fee retainer agreement whereby Klawitter retained Olsen to represent her in connection with all of her claims of bodily injuries and alleged damages arising out of an incident on July 23, 1998, which occurred at the Sebastopol Golf Course in Sebastopol, California, in exchange for a certain percentage of any recovery. (Id.) On or about January 13, 1999, Olsen filed an action on behalf of Klawitter entitled <u>Kathleen Klawitter v. Lee Farris, et al.</u>, Case No. 220841, in California Superior Court for the County of Sonoma (the "Klawitter Action"). (Id.)

On or about April 2002, Olsen contacted Harbison to request that Harbison associate into the Klawitter Action as trial counsel. (Id. at 4.) Olsen asserts that he and Harbison entered into an agreement, which provided that Harbison would associate into the Klawitter Action as co-counsel and would act as primary trial counsel therein, in exchange for a certain portion of the attorneys' fees recovered in that action. (Id.) On or about July 31, 2002, Klawitter signed an "Authorization Pursuant to Rule 2-200 of Professional Conduct" which acknowledged and authorized an agreement between Olsen and Harbison. (Id.) On or about June 25, 2002, Harbison formally associated into the Klawitter Action and became co-counsel of record for Klawitter. (Id.)

On August 16, 2002, Harbison advised Olsen that Klawitter would be discharging his services in the Klawitter Action and

4

that discharge would affect their fee agreement should Harbison
be retained directly by Klawitter in the Klawitter Action.  (<u>Id.</u>)
By letter dated August 12, 2002, Klawitter terminated Olsen as
her counsel in the Klawitter Action effective August 13, 2002.
(<u>Id.</u>)  On or about August 13, 2002, Klawitter retained Harbison
to solely represent her in the Klawitter Action.  (<u>Id.</u>)

On or about August 26, 2002, Olsen filed a "Notice of Lien"
in the Klawitter Action wherein Olsen claimed a lien for
attorneys' fees, costs and expenses on any settlement or judgment
in that action.  (<u>Id.</u>)

In early January 2003, the Klawitter Action was settled for
the sum of $775,000.  (<u>Id.</u>)  On or about January 28, 2003,
Harbison sent a letter to Olsen requesting that he immediately
withdraw the Notice of Lien filed in the Klawitter Action.  (<u>Id.</u>
at 4-5.)  Thereafter, Olsen and Harbison exchanged letters, with
Harbison generally disputing Olsen's claim of a lien on the
Klawitter Action and Olsen demanding payment for expenses and
fees to which he asserted he was entitled.  (<u>Id.</u> at 5.)

On July 24, 2003, the Klawitter Action was dismissed.  (<u>Id.</u>)
Neither Olsen nor Harbison have received any portion of the
attorneys' fees recovered in the settlement paid in the Klawitter
Action, which have been held in a trust account.  (<u>Id.</u>)

**C.   The Olsen Action**

Unbeknownst to Harbison, on or about February 3, 2003,
Olsen filed an action entitled <u>Christopher J. Olsen v. Joseph F.</u>
<u>Harbison, III, doing business as Law Offices of Joseph F.</u>
<u>Harbison, III & Associates</u>, Ventura County Superior Court Case
No. SC035315 ("the Olsen Action"), asserting claims for quantum

meruit and breach of contract. (<u>Id.</u>) Also unbeknownst to
Harbison, on or about April 17, 2003, Olsen filed a First Amended
Complaint in the Olsen Action, asserting causes of action for
(1) quantum meruit, (2) breach of contract, (3) fraud,
(4) intentional interference with contractual relationship,
(5) breach of fiduciary duty, and (6) declaratory relief and
imposition of constructive trust. (<u>Id.</u> at 6.) Harbison first
became aware of the Olsen Action on April 29, 2003, when a copy
of the First Amended Complaint was delivered to his office. (<u>Id.</u>
at 5.) Harbison demurred to the First Amended Complaint, and the
court sustained without leave to amend the demurrer as to Olsen's
quantum meruit cause of action. (<u>Id.</u> at 6.)

On May 2, 2003, Harbison tendered the Olsen Action to AMIC
for defense and indemnity under the Policy. (<u>See</u> <u>id.</u> at 5.) The
tender was received by AMIC on May 6, 2003. (Def.'s Resp. to
Pl.'s Stmt. of Undisputed Facts ["DRSUF"], filed June 5, 2009
[Docket # 51-2], ¶ 34.) Two days later, on May 8, 2003, Jeff
Goode of AMIC sent an email to Harbison denying coverage. (<u>Id.</u>)
Harbison contends that this denial was done without any
investigation of the claim. (<u>Id.</u>) AMIC disputes this
contention. (<u>Id.</u>) AMIC maintains Mr. Goode assumed Harbison's
alleged conduct constituted "professional services," and
acknowledged that Olsen's claims for general and consequential
damages were potentially covered under the Policy. (DRSUF ¶ 35.)
AMIC's denial was based solely on the policy's exclusion for any
claim "arising out of a criminal, intentionally wrongful,
fraudulent or malicious act or omission." (<u>Id.</u>)

On May 15, Harbison wrote to AMIC contesting the denial.
(DRSUF ¶ 37.)  AMIC referred the matter to coverage counsel,
Waxler, Carner, Weinreb & Brodsky.  (DRSUF ¶ 38.)  Mr. Goode did
no further independent investigation or evaluation of the claim.
(Id.)  On May 22, 2003, Harbison received a letter from AMIC's
coverage counsel, Andrew Waxler.  (DRSUF ¶ 39.)  Mr. Waxler
requested that Harbison provide copies of certain correspondence
between himself and Olsen, which referred to the lien and fee
issues.  (Id.)  On May 29, 2003, Harbison wrote to Mr. Waxler.
(DRSUF ¶ 40.)  He explained that the documents Mr. Waxler
requested referred to "only one part of a much larger picture,"
and invited him to meet and review the Olsen file.  (Id.)  AMIC
or its counsel never met with Harbison to discuss the Olsen
claim, and Harbison contends that AMIC never reviewed the Olsen
case files.  (DRSUF ¶ 42.)  AMIC disputes this contention.  (Id.)

Harbison provided the requested correspondence on June 10,
2003.  (DRSUF ¶ 43.)  Harbison again urged AMIC to review the
entire Olsen file, not just a few pieces of correspondence, and
to meet with him so AMIC's investigation would be "thorough,
accurate and meaningful."  (Id.)  Harbison did not hear from AMIC
for six weeks, and wrote to Mr. Waxler on July 21, 2003,
requesting a response.  (DRSUF ¶ 44.)

On July 22, 2003, AMIC again denied all obligations under
the policy.  (DRSUF ¶ 45.)  Mr. Goode conceded this July 22
response was untimely.  (DRSUF ¶ 46.)  By letter of August 20,
2003, Harbison explained why AMIC's coverage analysis was wrong
and implored AMIC to investigate the loss and reconsider its
position.  (DRSUF ¶ 47.)  On September 1, 2003, Harbison received

7

1  a letter from Mr. Waxler.  (DRSUF ¶ 48.)  He suggested that

2  Harbison look through all of the Olsen files himself and send him

3  any documents that support Harbison's request for coverage.

4  (Id.)  On September 9, 2003, Harbison wrote back to AMIC,

5  expressing his frustration with AMIC, and contending that AMIC

6  refused to review any information or give any real consideration

7  to its duty to defend.  (DRSUF ¶ 49.)  AMIC disputes this

8  contention.  (Id.)

9      Subsequently, Olsen filed a Second Amended Complaint

10  asserting causes of action for (1) breach of contract, (2) fraud

11  and deceit, (3) intentional interference with contractual

12  relationship, and (4) imposition of constructive trust.  (July 13

13  Order at 6.)  On or about March 30, 2004, Harbison forwarded the

14  Second Amended Complaint in the Olsen Action to AMIC and again

15  requested defense and indemnity under the Policy.  (Id.)  On or

16  about July 23, 2004, AMIC denied coverage.  (Id.)  AMIC provided

17  the following grounds for denial of coverage: (1) the Olsen

18  Action seeks the return of legal fees, costs and expenses from

19  Harbison, which do not constitute covered damages as defined by

20  the Policy; (2) the Olsen Action seeks punitive damages, which do

21  not constitute covered damages as defined by the Policy; (3) the

22  Policy excludes coverage for any claim arising out of an

23  intentionally wrongful, fraudulent or malicious act or omission,

24  and the Olsen Action seeks to hold Harbison liable for

25  intentionally wrongful, fraudulent and malicious acts;

26  (4) business disputes between lawyers over fees do not constitute

27  the rendering of "professional services" as defined by the

28  Policy; (5) the claim was not first made and reported to AMIC

8

during the policy period; and (6) prior to the effective date of the Policy, Harbison had a reasonable basis to believe that a claim would be made against him.  (Id.)

On September 1, 2004, Harbison wrote to AMIC, giving it a final opportunity to honor its defense obligation.  (DRSUF ¶ 54.) On December 1, 2004, Harbison filed a complaint in this court against AMIC, in which he asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.  On July 12, 2005, the court ruled on Harbison's and AMIC's cross-motions for summary judgment.  (Pl.'s Resp. to AMIC's Stmt. of Undisputed Facts ["PRSUF"], filed May 29, 2009 [Docket # 44], ¶ 14.)  The court granted AMIC's motion, holding AMIC did not have a duty to defend Harbison in the Olsen Action because Olsen's claims did not arise out of an error or omission in providing professional services, since Olsen was not Harbison's client and could not assert a malpractice claim against him; accordingly, the court found there was no potential for coverage under the Policy.  Harbison appealed, and the Ninth Circuit reversed this court's decision, finding a potential for coverage as a result of Olsen's allegations that Harbison's tortious statements to Klawitter, a client, made during Harbison's provision of professional services to her, interfered with the contractual relationship between Olsen and Klawitter. (PRSUF ¶¶ 15-16).[2]

_____

[2]    The parties' various objections to each other's evidence are overruled.  (See Pl.'s Objs. to Evid., filed May 29, 2009 [Docket #46]; Def.'s Objs. to Evid., filed June 5, 2009 [Docket #51-3].)  In large part the objections are moot as the court does not rely on the objected-to evidence; however, to the extent certain objected-to evidence is cited above, the court

1

**STANDARD**

2    The Federal Rules of Civil Procedure provide for summary

3 adjudication when "the pleadings, depositions, answers to

4 interrogatories, and admissions on file, together with

5 affidavits, if any, show that there is no genuine issue as to any

6 material fact and that the moving party is entitled to a judgment

7 as a matter of law."  Fed. R. Civ. P. 56(c).  One of the

8 principal purposes of the rule is to dispose of factually

9 unsupported claims or defenses.  <u>Celotex Corp. v. Catrett</u>, 477

10 U.S. 317, 325 (1986).

11    In considering a motion for summary judgment, the court must

12 examine all the evidence in the light most favorable to the

13 non-moving party.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654,

14 655 (1962).  If the moving party does not bear the burden of

15 proof at trial, he or she may discharge his burden of showing

16 that no genuine issue of material fact remains by demonstrating

17 that "there is an absence of evidence to support the non-moving

18 party's case."  <u>Celotex</u>, 477 U.S. at 325.  Once the moving party

19 meets the requirements of Rule 56 by showing there is an absence

20 of evidence to support the non-moving party's case, the burden

21 shifts to the party resisting the motion, who "must set forth

22 specific facts showing that there is a genuine issue for trial."

23 <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

24 Genuine factual issues must exist that "can be resolved only by a

25 finder of fact, because they may reasonably be resolved in favor

26 of either party."  <u>Id.</u> at 250.  In judging evidence at the

27 _____

28 overrules the relevant party's objection.

summary judgment stage, the court does not make credibility
determinations or weigh conflicting evidence.  See T.W. Elec. v.
Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir.
1987) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp., 475 U.S. 574, 587 (1986)).  The evidence presented by the
parties must be admissible. Fed. R. Civ. P. 56(e).  Conclusory,
speculative testimony in affidavits and moving papers is
insufficient to raise genuine issues of fact and defeat summary
judgment.  See Falls Riverway Realty, Inc. v. City of Niagara
Falls, 754 F.2d 49, 57 (2d Cir. 1985); Thornhill Publ'g Co., Inc.
v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

**ANALYSIS**

AMIC moves for summary judgment, arguing it did not breach
the covenant of good faith and fair dealing when it denied
Harbison coverage in the Olsen Action.  "In addition to the
duties imposed on contracting parties by the express terms of
their agreement, the law implies in every contract a covenant of
good faith and fair dealing." Egan v. Mutual of Omaha Ins. Co.,
24 Cal. 3d 809, 818 (1979) (citations omitted).  "The insurer,
when determining whether to settle a claim, must give at least as
much consideration to the welfare of its insured as it gives to
its own interests." Id.  "The implied covenant imposes
obligations not only as to claims by a third party but also as to
those by the insured." Id.  "[When] the insurer unreasonably and
in bad faith withholds payment of the claim of its insured, it is
subject to liability in tort." Id.  "For the insurer to fulfill
its obligation not to impair the right of the insured to receive
the benefits of the agreement, it again must give at least as

11

much consideration to the latter's interests as it does to its own." <u>Id.</u> at 818-19. "To protect [the insured's] interests it is essential that an insurer fully inquire into possible bases that might support the insured's claim . . . an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." <u>Id.</u> at 819.

AMIC contends that it did not breach its covenant of good faith and fair dealing when it denied plaintiff coverage in the Olsen Action. Specifically, AMIC argues that (1) it conducted a reasonable and adequate investigation of the claim, (2) it handled the claim in a timely manner, (3) the court's granting of summary judgment for AMIC is probative of the reasonableness of AMIC's coverage position, (4) the genuine dispute doctrine can and does apply to a legal dispute over the duty to defend, and (5) punitive damages against AMIC are not justified. In response, Harbison contends that AMIC acted in bad faith when refusing to provide coverage for his claim.

### A.   <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

The implied covenant of good faith and fair dealing is breached when an insurer delays or denies payment of policy benefits unreasonably or without proper cause. <u>Jordan v. Allstate Ins. Co.</u>, 148 Cal. App. 4th 1062, 1072 (2007); <u>see also</u> <u>Wilson v. 21st Century Ins. Co.</u>, 42 Cal. 4th 713, 723 (2007) ("an insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable."). The "key to a bad faith claim is whether or not

the insurer's denial of coverage was reasonable . . . . [The] reasonableness of an insurer's claim-handling conduct is ordinarily a question of fact." Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1009-10 (9th Cir. 2004) (citing Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161 (9th Cir. 2002).

Harbison argues that defendant breached the implied covenant of good faith and fair dealing because it acted unreasonably in denying plaintiff's claim. First, Harbison claims that AMIC wrongfully concluded that the Olsen complaint stated no potential for coverage and relieved it of its duty to defend without a full or proper investigation; specifically, Harbison contends that AMIC wrongfully reached this conclusion without conducting any investigation of his claim. However, AMIC maintains that the complaints and attached exhibits by themselves contained enough information to comprehend the nature of the tendered claim, and therefore, while it may have reached an erroneous conclusion, it was an objectively reasonable judgment as to its duty to defend. Second, Harbison claims that AMIC's response to its claim was untimely. AMIC contends that its original denial of coverage was timely, and that subsequently it simply maintained its original position in response to Harbison's efforts to have the company do otherwise. Third, Harbison argues that the genuine dispute doctrine does not apply to third-party duty to defend cases, and thus does not shield AMIC from liability. AMIC responds that the genuine dispute doctrine can and does apply to a legal dispute over the duty to defend. Finally, Harbison claims that AMIC is not entitled to summary adjudication of his punitive damages

13

claim, as there is clear and convincing evidence of oppression, fraud or malice within the meaning of Cal. Civil Code § 3294(a). AMIC argues that punitive damages against it are unjustified because Harbison cannot show that AMIC's actions amounted to oppressive, fraudulent or malicious conduct.

### 1.   Genuine Dispute Doctrine

Because if applicable to third-party duty to defend cases, the genuine dispute doctrine can provide a complete defense for AMIC, the court addresses this issue first.

An insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable. <u>Wilson v. 21st Century Ins.</u>, 42 Cal. 4th 713, 723 (2007). An insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract. <u>Id.</u> (quoting <u>Chateau Chamberay Homeowners Assn. v. Associated Int'l Ins. Co.</u>, 90 Cal. App. 4th 335, 347 (2001)). However, "[t]he genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." <u>Id.</u> (emphasis in original). Furthermore, the genuine dispute doctrine does not "alter the standards for deciding and reviewing motions for summary judgment." <u>Id.</u> at 724. As the <u>Wilson</u> court explained:

1
2
3
4
5
6
7
8

> The genuine issue rule in the context of bad faith
> claims allows a [trial] court to grant summary judgment
> when it is undisputed or indisputable that the basis
> for the insurer's denial of benefits was reasonable . .
> . . On the other hand, an insurer is not entitled to
> judgment as a matter of law where, viewing the facts in
> the light most favorable to the plaintiff, a jury could
> conclude that the insurer acted unreasonably.  Thus, an
> insurer is entitled to summary judgment based on a
> genuine dispute over coverage or the value of the
> insured's claim only where the summary judgment record
> demonstrates the absence of triable issues . . . as to
> whether the disputed position upon which the insurer
> denied the claim was reached reasonably and in good
> faith.

9   Id. at 724 (citations omitted).

10      One court has found that the genuine dispute doctrine may be

11  applicable to third party, duty to defend cases.  Delgado v.

12  Interinsurance Exch. of the Auto. Club of So. Cal. 152 Cal. App.

13  4th 671, 691-92 (2007) (on appeal).  There, the court discussed

14  whether the genuine dispute doctrine applied to third party cases

15  involving an insurer's refusal to provide a defense, stating in

16  *dicta* that if the case involved a legal dispute over the

17  insurer's duty to defend, then the genuine dispute doctrine would

18  probably apply, but if the case involved a factual dispute, then

19  the very existence of that dispute created the potential for

20  coverage, thereby establishing the duty to defend.  Id. at 843-

21  44.  The Delgado court held that a legal dispute arises when

22  there is a question whether the undisputed facts constitute an

23  "occurrence" under the policy, or when coverage can be determined

24  as a matter of law, based solely on interpretation of the

25  contract.  Id. at 842.  By contrast, the court identified a

26  factual dispute as one in which the determination of coverage

27  turns on disputed facts.  Id.

28

1    AMIC contends that the dispute with Harbison over the duty

2  to defend is purely legal, and therefore the genuine dispute

3  doctrine applies.  However, as an initial matter, the court notes

4  that no court has applied the genuine dispute doctrine to a

5  third-party, duty to defend case.  Indeed, in Delgado the court

6  found that the genuine dispute doctrine did not apply to the

7  facts of that case, because a factual dispute existed as to

8  coverage, rather than a purely legal dispute.  Delgado, 152 Cal.

9  App. 4th at 844.  Furthermore, despite the Delgado court's

10  finding that the genuine dispute doctrine may apply if the

11  dispute over coverage is purely legal, this court is not

12  convinced that the doctrine should ever properly apply where

13  there is dispute as to coverage, legal or factual.  This is

14  because where there is the potential for coverage, an insurer's

15  duty to defend is triggered.  Montrose Chem. Corp. v. Superior

16  Court, 6 Cal. 4th 287, 299-300 (1993).  By definition, the

17  genuine dispute doctrine is only applicable where there is "a

18  genuine issue as to the insurer's liability under the policy."

19  Chateau Chamberay, 90 Cal. App. 4th at 347.  Because the

20  existence of a genuine dispute as to the insurer's liability

21  indicates that there is at least a potential for coverage, the

22  existence of a genuine dispute is itself enough to trigger the

23  insurer's duty to defend.  Accordingly, this court finds that the

24  genuine dispute doctrine appears wholly incompatible with duty to

25  defend cases.

26    However, even assuming arguendo that the genuine dispute

27  doctrine is applicable to duty to defend cases, the court

28  nevertheless finds that summary judgment in favor of AMIC

pursuant to the genuine dispute doctrine is precluded under Wilson. See Wilson, 42 Cal. 4th 713.  Here, both parties to the dispute have advanced reasonable positions with respect to Harbison's bad faith claim.  Harbison contends that AMIC denied coverage without any investigation of the claim, and that AMIC continually refused to examine additional documents that would allegedly have revealed the potential for coverage and thereby triggered AMIC's duty to defend.  Viewing the facts in the light most favorable to plaintiff, a jury could conclude that AMIC acted unreasonably in refusing to defend Harbison.  Because there is a triable issue of fact as to whether AMIC's denial of benefits was done reasonably and in good faith, under Wilson, the court may not grant AMIC's motion for summary judgment as to Harbison's bad faith claim.

### 2.   Improper or Inadequate Investigation

AMIC contends that it conducted a reasonable and adequate investigation of Harbison's claim with respect to the Olsen Action, and therefore it is entitled to summary judgment on Harbison's bad faith claim.

The insurer's duty to protect the insured's interests obligates it to investigate a claim thoroughly.  "Among the most critical factors bearing on the insurer's good faith is the adequacy of its investigation of the claim. '[T]he covenant of good faith and fair dealing implied in all insurance agreements entails a duty to investigate properly submitted claims.'"  Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc., 78 Cal. App. 4th 847, 879-80 (2000).  "Though some authority tends to equate a bad faith failure to investigate with negligence, the

17

better view appears to be that it must rise to the level of unfair dealing." <u>Id.</u> at 880.  "An unreasonable failure to investigate amounting to such unfair dealing may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages." <u>Id.</u>  If the insurer becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under an insuring agreement, an insurer has a duty to defend.  <u>Waller v. Truck Ins. Exchange</u>, 11 Cal. 4th 1, 19 (1995).  Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy.  <u>Id.</u> The duty to defend should be determined by reference to the policy, the complaint, and all facts known to the insurer from any source.  <u>Montrose</u>, 6 Cal. 4th at 300.  A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim.  <u>Amadeo v. Principal Mut. Life Ins. Co.</u>, 290 F.3d 1152, 1164 (9th Cir. 2002).  Finally, "to prevail [on the duty to defend], the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." <u>Montrose</u>, 6 Cal. 4th at 300 (emphasis in original).

Here, Harbison argues that AMIC, in bad faith, failed to conduct any investigation prior to denying Harbison coverage. After this initial denial, Harbison wrote to AMIC contesting the denial.  Harbison contends that instead of calling him to better understand the nature of the dispute, AMIC merely asked for

certain copies of correspondence pertaining to the lien and fee issues, which represented "only one part of a much larger picture." (DRSUF ¶ 40.) Harbison claims that: (1) he invited AMIC to meet with him to review the Olsen file, which AMIC refused; (2) AMIC's limited request for his correspondence with Olsen constituted its entire investigation of the claim, and that this correspondence had nothing to do with the tort allegations and associated damages that constituted the basis for coverage; (3) he again urged AMIC to review the entire file, and to meet with him in order to ensure the investigation was thorough, accurate, and meaningful; (4) upon AMIC's confirmation of its earlier denial of coverage, Harbison again wrote AMIC and explained why he thought AMIC's coverage analysis was wrong, and again asked AMIC to conduct a more thorough investigation; (5) AMIC responded by asking Harbison to send it any documents that supported his request for coverage; and finally, (6) after Harbison tendered Olsen's Second Amended Complaint, AMIC again denied any obligation to defend or indemnify Harbison with respect to the Olsen Action.

In contrast, AMIC argues that: (1) it reasonably investigated Harbison's claim by thoughtfully reviewing the complaint and the insurance policy before denying coverage; (2) it had enough information from the multiple complaints and attached exhibits in the Olsen Action to comprehend the nature of the tendered claim, and that further investigation would have been unnecessary; (3) no amount of factual investigation would have changed its analysis that a fee dispute between two attorneys was not covered under the lawyer's professional

liability policy that it issued to Harbison; and (4) rather, its denial of coverage turned upon the policy language and the allegations of the complaints, and this constituted a reasonable investigation of the claim.

Based on the above assertions proffered by both Harbison and AMIC, triable issues of material fact exist as to whether AMIC conducted a proper and adequate investigation of Harbison's claim. While it is true that the insurer need not "turn over every rock or look in every nook and cranny" in search of a valid claim, it nevertheless has a duty to defend where it becomes aware of facts giving rise to a potential for coverage. See Waller, 11 Cal. 4th at 19.

AMIC also states that after reviewing Harbison's complaint, it concluded that the policy's exclusions applied to the Olsen Action. However, the insurer may not limit its inquiry to the complaint; rather, the duty to defend is determined by reference to the policy, the complaint, and all facts known to the insurer from any source. See Montrose, 6 Cal. 4th at 300.[3]  Furthermore, "the insurer's early closure of an investigation and unwillingness to reconsider a denial when presented with evidence of factual errors will fortify a finding of bad faith." See

---

[3]    The court notes that AMIC cites American Int'l Bank v. Fid. & Deposit Co. of Md. for the proposition that an insurer's review of the complaint and policy alone constitutes an adequate investigation of an insured's claim. Am. Int'l, 49 Cal. App. 4th 1558, 1565 (1996). However, that case is factually distinguishable from the situation here, for there the court found that the insurer's investigation, limited to an examination of the complaint and the policy, was sufficient because the parties could not reasonably have expected that coverage would include plaintiff's uncovered economic losses. For the reasons set forth above, such is not the case here.

1  Shade Foods, 78 Cal. App. 4th at 880.  After initially denying

2  Harbison's claim in merely two days, AMIC maintained its position

3  until the Ninth Circuit ruled otherwise.  Thus, triable issues of

4  fact exist as to whether AMIC unreasonably denied coverage

5  without conducting a proper investigation as to Harbison's claim.

6      Accordingly, because triable issues of fact exist regarding

7  whether AMIC failed to properly investigate Harbison's claim,

8  AMIC's motion for summary judgment must be DENIED on this basis.

9              **3.   Untimely Investigation**

10     Because the court finds triable issues of fact pertaining to

11 the reasonableness of AMIC's investigation of Harbison's claim,

12 it is unnecessary to discuss Harbison's claim that AMIC's

13 investigation was untimely.

14       **4.   The Court's Previous Granting of Summary Judgment**

15     AMIC claims that this court's previous grant of summary

16 judgment in its favor is probative of the reasonableness of

17 AMIC's coverage position.

18     "[P]ublic policy mandates that the reasonableness of the

19 insurer's decision must be evaluated as of the time it was made,

20 and that no subsequent court ruling can be the justification for

21 the decision."  Filippo Industries, Inc. v. Sun Ins. Co. of N.Y.,

22 74 Cal. App. 4th 1429, 1441 (1999).  "[If the trial court's

23 previous ruling was considered presumptively reasonable] there

24 could be no question of bad faith.  Such a presumption would have

25 the practical effect of denying the insured its right to appeal

26 the trial court ruling because, even if the trial court were

27 reversed, the initial finding would preclude bad faith as a

28 matter of law . . . . such a conclusion in the insurance context,

1  where legal knowledge is not a prerequisite, is unfounded." Id.

2      AMIC cites Morris v. The Paul Revere Life Ins. Co. for the

3  proposition that "[t]he fact that a court interpreted the law in

4  the same manner as the insurer is probative of the

5  reasonableness, though not necessarily correctness, of the

6  insurer's coverage position." 109 Cal. App. 4th 966, 976 (2003).

7  However, Morris is distinguishable from the current case because

8  there, the court was deciding the reasonableness of an insurer's

9  coverage decision in light of conflicting case law in which under

10 analogous circumstances, some courts had decided in favor of the

11 insurer and others had decided in favor of the insured. Id.

12 Because various courts disagreed with each other on this point of

13 law, the Morris court determined that the insurer, acting with

14 "the highest courts of several jurisdictions, as well as two

15 California Courts of Appeal, in its corner," was not unreasonable

16 in its coverage decision. Id.

17      Such is not the case here. This is not a situation in which

18 the insurer faced the difficult question of whether an insured's

19 claim was covered in light of conflicting case law. Rather, AMIC

20 denied Harbison coverage in spite of the well-established

21 principle that where there is a bare potential or possibility of

22 coverage, the duty to defend is triggered. See Montrose, 6 Cal.

23 4th at 299-300. Having denied that duty, AMIC must now face

24 Harbison's bad faith claim. The court's previous ruling granting

25 summary judgment to defendant does not provide defendant a

26 defense, nor is it admissible evidence supporting the

27 reasonableness of defendant's denial of coverage.

28

1    Thus, the court finds that under <u>Filippo Industries</u>, its

2    prior decision in favor of AMIC's motion for summary judgment

3    does not preclude a finding of bad faith in AMIC's denial of

4    coverage.

5        **B.   <u>Punitive Damages</u>**

6    AMIC argues that there are no facts supporting Harbison's

7    entitlement to punitive damages.  Civil Code § 3294, subdivision

8    (a), authorizes recovery of punitive damages in a tort action if

9    there is clear and convincing evidence that the defendant has

10   been guilty of "oppression, fraud, or malice."  <u>Shade Foods v.</u>

11   <u>Innovative Products Sales & Marketing, Inc.</u>, 78 Cal. App. 4th

12   847, 890-91 (2000).  In insurance cases, punitive damages can be

13   most plausibly justified by a finding of oppression or malice.

14   <u>Id.</u> at 891.  "Oppression" is defined to mean "despicable conduct

15   that subjects a person to cruel and unjust hardship in conscious

16   disregard of that person's rights."  <u>Id.</u>  "Malice" is defined to

17   mean "despicable conduct which is carried on by the defendant

18   with a willful and conscious disregard of the rights or safety of

19   others."  <u>Id.</u>  "Used in its ordinary sense, the adjective

20   'despicable' is a powerful term that refers to circumstances that

21   are 'base,' 'vile,' or 'contemptible.'"  <u>Id.</u>  With regard to

22   evidence required for the recovery of punitive damages, the same

23   evidence is relevant to both the finding of bad faith and the

24   imposition of punitive damages, but "[t]he conduct required to

25   award punitive damages for the tortious breach of contract is of

26   a different dimension [than that required to find bad faith]."

27   <u>Id.</u>  "The evidence in support of the award of punitive damages

28   must satisfy a distinct and far more stringent standard."  <u>Id.</u>

1   Civil Code § 3294 requires proof "by clear and convincing

2   evidence" that the defendant is guilty of oppression, fraud, or

3   malice.  Id.  "Clear and convincing evidence requires a finding

4   of high probability . . . . '[the evidence must be] so clear as

5   to leave no substantial doubt'; 'sufficiently strong to command

6   the unhesitating assent of every reasonable mind.'"  Id.

7        In deciding whether the insurer's coverage decision met the

8   standard of conduct necessary for recovery of punitive damages,

9   the court in Shade Foods noted that an insurer's conduct might

10  meet the standard for "malice" or "oppression" and yet still not

11  be so contemptible to qualify as "despicable."  Shade Foods, 78

12  Cal. App. 4th at 892.  In that case, the court also noted that a

13  record that presents a close case with regard to the sufficiency

14  of the evidence of bad faith will inevitably provide a tenuous

15  basis for supporting an award of punitive damages, since a

16  finding of bad faith and punitive damages depends on inferences

17  drawn from the same evidence.  Id. at 893.  As the court stated,

18  a "marginally sufficient case of bad faith is not likely to prove

19  malice or oppression by clear and convincing evidence."  Id. at

20  909-10.

21       Nevertheless, some courts have found that failure to conduct

22  an adequate investigation was sufficient to support jury findings

23  or withstand summary judgment with regard to punitive damages.

24  See Amadeo, 290 F.3d at 1165 (stating that insured's claim

25  withstood summary judgment with regard to punitive damages

26  because there was sufficient evidence that denial of the

27  plaintiff's claim went beyond "the unfortunate result of poor

28  judgment," resulting instead from a plainly unreasonable

                                24

1   interpretation of the policy and deliberately restricted

2   investigation in an attempt to deny benefits); see also Tibbs v.

3   Great American Ins. Co., 755 F.2d 1370, 1375 (9th Cir. 1985)

4   (finding sufficient evidence to support punitive damages where

5   insurer conducted little or no investigation into its duty to

6   defend, did not compare the plaintiff's claim with the insurance

7   company's policy, and did not inspect the policy itself).

8        Interpreting the facts of the present case in the light most

9   favorable to plaintiff, the court finds sufficient evidence for

10  Harbison's punitive damages claim to survive summary judgment.

11  Harbison claims that AMIC adopted an unreasonable coverage

12  position, failed to conduct *any* investigation, or if it did

13  conduct an investigation, limited its inquiry to information that

14  would allow it to deny Harbison's claim, and obstinately

15  persisted in its initial wrongful position.  Harbison also

16  contends that in failing to conduct a reasonable investigation,

17  AMIC refused to look into the facts or files that Harbison

18  offered, instead limiting its inquiry to the complaints and

19  limited correspondence between Harbison and Olsen.  Thus, the

20  court finds that there is a triable issue of fact as to whether

21  AMIC's denial of coverage was conducted in bad faith to the

22  extent that its conduct constituted "despicable" "oppressive,

23  fraudulent, or malicious" conduct.

                            **CONCLUSION**

25       For the foregoing reasons, AMIC's motion for summary

26  judgment of Harbison's breach of the implied covenant of good

                                25

1  faith and fair dealing and punitive damages claims is DENIED.

2      IT IS SO ORDERED.

3  DATED: June 24, 2009

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

26